UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In the matter of an infant under the age of 16

EDGAR HERNAN PARRA SAAVEDRA,                     Case No.: 21-cv-5418

                            Petitioner,    **AFFIRMATION IN OPPOSITION**

-against-

ALISON ESTEFFANY JIMENEZ MONTOYA,

                            Respondent.
-----------------------------------------------------------X

      **ROBERTO L. PAGAN LOPEZ,** an attorney duly admitted to practice law in the State of New York and the Eastern District of New York hereby affirms the following under the penalty of perjury, pursuant to CPLR §2106:

1. I am the owner and principal of the Pagan Lopez Law Office, attorneys for Respondent Alison Esteffany Jimenez Montoya, in the above-captioned action. As such, I am familiar with the facts and circumstances of this case and the proceedings heretofore had herein. I submit this affirmation in opposition to Petitioner's Motion and Petition for an order:

    a. Directing that immediate and ongoing access to the child be given to the Petitioner;

    b. Setting an early hearing on the Petition and directing that Respondent appear with the child and show cause why the child should not be returned immediately to Colombia, his country of habitual residence, and communicate the hearing date and time to Petitioner so that Petitioner may provide Respondent notice of these proceedings and the hearing pursuant to ICARA §9003(c);

    c.  Prohibiting Respondent from removing the child from the jurisdiction of this Court until the Court has decided this case, and directing the Respondent to bring the child to this Court and without delay to deliver to the Clerk of Court the Respondent's and the child's passports and all other travel documents to be held until further order of the court and to prohibit the request of any new travel documents for the child;

    d.  Pursuant to Article 12 of the Hague Convention and ICARA §9003 requiring Respondent to return the child to Petitioner and Colombia forthwith; and

    e.  Directing Respondent to pay Petitioner's legal costs, fees and other expenses, and any such other relief as justice requires.

## FACTUAL BACKGROUND

2. Petitioner and Respondent met on or about 2011 and had a "de facto" marriage since 2013.

3. Since 2010, after finishing high school, the Respondent commenced on the job as a sex worker, and it was in this environment that the parties met.

4. The Petitioner made an offer to the Respondent to pay for her tuition and expenses if she would quit that industry.

5. The conditions were that the Respondent had to move to a place of the Petitioner's choosing and change her phone (number and device) to one that he provided her and to enroll in studies of what he wanted her to study.

6. At this point in 2011, they parties were not living together but they would see each other in a regular basis, weekly or bi-weekly.

7. He would exercise control over her time, interactions with family, where could she stay and who could she see or talk to.

8. Respondent later realized that the Petitioner had access to the phone he gave her and would monitor her every move and conversation.

9. On or about 2013, they started living together upon objections from the Respondent's family that did not like the Petitioner's attitude towards them and the control that he exercised in all aspects of her life.

10. Even though the Petitioner had requested the Respondent to quit the sex working industry, he would still visit these places and force the Respondent to go with him and see him interact and pay for the services of other sex workers to take care of him in her presence.

11. On August 2, 2014, the child MJP was born to the parties in Colombia.

12. The birth was through an emergency cesarean section due to health complications for both child and mother.

13. When the Respondent was discharged from the hospital, the Petitioner left her and the newborn baby by themselves and prohibited the Respondent from having any family member go and help take care of her recovery.

14. Building staff from the residential complex they lived in, realized what was happening and secretly helped her during her recovery to avoid upsetting the Petitioner.

15. During the first years of the minor, the Petitioner never showed interest for his wellbeing, and never showed any interest in celebrating a birthday, nor took to or attended any daycare/school activities other than attending the 3 year birthday celebration in the pre-school the child attended.

16. Petitioner had a boldly marked preference for the child from his previous relationship and prohibited the contact between the two siblings.

17. Petitioner's parents and family would avoid the child and hide from him and the Respondent if they, coincidentally, bumped into each other in a public place such as a mall or park.

18. The Petitioner would call the Respondent or her family to confirm if MPJ was at a park that they use to frequent. If he was there, the Petitioner would tell them to leave because he was taking his other child and did not want them to interact. Now, this is a public park.

19. Around 2015, the Respondent could not take a harassment from the Petitioner and moved out of the place Petitioner wanted her to stay at.

20. At this point, the Petitioner started blackmailing the Respondent by telling her that he had a level of technological knowledge that he had been keeping videos/audios and intimate pictures of the Respondent that he would make public if she did not do what he asked her to.

21. In 2017, there was a Halloween party where the parties attended. In that party the Petitioner got drunk and wanted to force the Respondent to go with him to a brothel and, because the Respondent did not agree to go, the Petitioner told her to find a way to get home by herself.

22. The next day, the Petitioner arrived very angry and violent to the point that the neighbors had to call the police to calm things down.

23. During that month, to try to calm things down, the Petitioner executes a second authorization for the minor MPJ to travel to the United States to visit his family form the side of the mother.

24. On or about 2018, after the Respondent's trip to the USA, the parties separated as the Respondent finally saw peace and tranquility away from the Petitioner.

25. Throughout their relationship, Petitioner was controlling, manipulative and abusive to Respondent and in the presence of the child.

26. After they separated, the Petitioner continuously insisted that he wanted to get back with the Respondent and wanted her to go live with him under the same conditions as before.

27. Around 2019, the Respondent starts a long-distance relation with Ryan Portela, who she later married.

28. Mr. Portela lived in New York City and the Respondent lived in Colombia.

29. In September of 2020, the Respondent's family sent her money to travel to the United States.

30. During the Respondent's stay in the United States, the Petitioner would only call, at most, once weekly or every other week for which the Respondent and her child were calm to have very little interactions with the Petitioner.

31. In December of 2020, Mr. Portela and the Respondent got married.

32. The Petitioner was unaware of the Respondent's marriage and, at this point, was still insisting and professed hopes of retaking his relationship with the Respondent, sending songs and stating that "time made him see things with the correct eyeglasses", that he wanted a home with Respondent and that she was a great mother.

33. On December 13, 2020, the Respondent informed the Petitioner that she intended to stay in the United States.

34. It was then that he started calling multiple times daily and, **then** insisting on talking to the child every day and, for this purpose, the Respondent gets a cellphone for the child to have direct access with his father (the Petitioner) and the father with him.

35. In February of 2021, the Petitioner found a way to contact the Respondent's husband which had as a result that the Respondent's husband, Ryan Portela, assaulted and almost ended the Respondent's life.

36. The reason that the Respondent know that this was the result of the communications of the Petitioner with her husband is that Mr. Portela was making the claims to her that he had reliable sources because the source was the father of the child, this as he beat her up and strangled her almost to death. As a result of this incident an order of protection was issued, and Mr. Portela was arrested.

37. When the Respondent was safe from the attacks of her husband, she texted the Petitioner telling him that he almost got her killed because of ill heart and evil intentions and he was putting their son at risk as she was sleeping with MPJ when her husband dragged her out by her hair and almost killed her in the living room.

38. When she texted him the pictures of her injuries, he published it in a webpage he was using to disparage and defame the Respondent and claimed that she had put their son in danger by living with aggressive and dangerous people.

39. As a result of all the harassment, persecution, social media bullying and electronic bullying and hacking, threats, and history of abuse from the Petitioner, the Respondent hired an attorney in Colombia to report all these illegal activities from the Petitioner against the Respondent.

40. When the Petitioner was interviewed as part of the investigation, uncertain as of how, the Petitioner obtained confidential information contained in the investigation file and started threatening and harassing the witnesses that had given a statement against him to the detectives investigating the report.

41. This is the subject of another complaint that was filed on behalf of the Respondent by her Colombian attorney.

42. This attorney is available to testify as to the facts which he has personal knowledge and to the history of the process in Colombia.

43. The threatened witnesses will be available to testify virtually should this come to be necessary and attest to the fact that they were threatened by the Petitioner for telling the truth about his behavior with the Respondent and the subject child.

44. As can be seen by the attached **Exhibit A**, there is exhaustive evidence of the abuse suffered by Respondent at the hands of Petitioner. The documents attached are written in Spanish but the Respondent has ordered an official translation and they will be provided as soon as they are available. Respondent respectfully requests that the court accept these documents without translation or, in the alternative, provide time for Respondent to have these documents translated as we had no opportunity translate such lengthy documents.

45. Based on the above and attached, Respondent respectfully requests that Petitioner's Motion and Petition be denied in its entirety, or in the alternative, have the decision be withheld until a proper trial is held and all of the issues of facts are heard by this Court.

I. **THE RELIEF REQUESTED BY PETITIONER SHOULD NOT BE GRANTED UNTIL THE COURT CONDUCTS A PROPER TRIAL**

46. While the decision in Abbot v. Abbot [560 US 1 (2010)]provides Petitioner with standing to prosecute their Petition under the Hague Convention, Article 13 of the Hague Convention is clear:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution, or other body which opposes its return establishes that –

> b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation

47. As has been established by the excessive amount of evidence showing Petitioner's abuse of Respondent, forcing the child to return back to Colombia and to Petitioner would place the child at grave risk of physical and/or psychological harm.

48. The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. See, e.g., Arts. 4, 12, ibid. [Abbott v. Abbott, 560 U.S. 1, 9 (2010)]

49. Under Abbott v. Abbott:

> While a parent possessing a *ne exeat* right has a right of custody and may seek a return remedy, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. One exception states return of the child is not required when "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b), Treaty Doc., at 10. If, for example, Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer "psychological harm" or be placed "in an intolerable situation." See, e.g.,Baran v. Beaty,526 F.3d 1340, 1352–1353 (C.A.11 2008); Walsh v. Walsh,221 F.3d 204, 220–221 (C.A.1 2000). (*Id.* at 22)

50. Per In re Application of Olguin v. Santana:

> The court where the petition is brought "has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." Id. at 245 (quotation marks omitted); 42 U.S.C. § 11601(b)(4). First, the court must determine whether the child has been "wrongfully removed or retained." Blondin II,189 F.3d at 245; 42 U.S.C. § 11601(a)(4). A wrongful removal under the Convention includes one "in breach of rights of custody . . . under the law of the State in which the child was habitually resident." Blondin IV,238 F.3d at 157 (quoting the Convention , art. 3) (ellipsis in original).
> Once a petitioner establishes that removal was wrongful, the child must be returned to the country of his habitual residence unless the respondent can establish one of the four "narrow" exceptions to repatriation. Id. at 157; see also 42 U.S.C. § 11601(a)(4).

> These four exceptions are: (1) that there is a grave risk that repatriation would expose the child to harm; (2) that the repatriation would not be permitted by fundamental principles related to the protection of human rights; (3) that judicial proceedings were not commenced within a year of the abduction and the child is well-settled in the new environment; and (4) that petitioner was not actually exercising custody rights at the time of the removal. See Convention , arts. 13(b) ; 20; 12; and 13(a) respectively. In addition, under an unnumbered provision of Article 13, a court may deny repatriation where the child objects to being returned and has attained an age and degree of maturity such that it is appropriate to take the child's views into account. See Blondin IV, 238 F.3d at 166. [03 CV 6299 (JG), at *12-13 (E.D.N.Y. Jan. 13, 2005)]

51. The court in *Olguin* further explained:

> There is a spectrum of harms a repatriated child may suffer. At one end "are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do." Id. at 162.
>
> In describing the type of factual scenario that falls within the 13(b) grave-risk exception, the Department of State wrote:
>
>> An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes . . . the child to safeguard [him] against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm. Blondin IV,238 F.3d at 162 (quoting 51 Fed. Reg. 10494, 10510 (1986)); cf. Blondin v. Dubois,78 F. Supp. 2d 283, 298 (S.D.N.Y. 2000) ("Blondin III") (explaining that although the State Department's illustration referred to sexual abuse rather than physical abuse, there was no reason to conclude that a father's physical abuse of a child, or his physical abuse of the mother in front of that child, would be any more tolerable). [*Id.* at *14-15 (E.D.N.Y. Jan. 13, 2005)]

52. Under the "grave risk" defense, "…respondent may prove by clear and convincing evidence that there is a "grave risk " that returning the child would expose him or her to physical or psychological harm. 22 U.S.C. § 9003(e)(2)(A)." [Rubio v. Castro, 19-CV-2524(KAM)(ST), at *51 (E.D.N.Y. Oct. 15, 2019)]

53. "To meet the clear and convincing evidence standard, the evidence presented must "place in the ultimate factfinder an abiding conviction that the truth of the factual contentions is highly probable." Colorado v. New Mexico, 467 U.S. 310, 314 (1984) (explaining that to meet the clear and convincing evidence standard, the evidence presented must "place in the ultimate factfinder an abiding conviction that the truth of the factual contentions is highly probable"); see also Black's Law Dictionary (10th ed. 2014) (defining "clear and convincing" as "highly probable" or "reasonably certain")." [*Id.* at 51]

54. However, "'Subsidiary facts[, however,] may be proven by a preponderance of the evidence.' Souratgar, 720 F.3d at 103 (citation omitted). Thus, 'there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence.' Danaipour v. McLarey, 183 F. Supp. 2d 311, 315 (D. Mass. 2002) ("The district court held that subsidiary facts must be proved by a preponderance of the evidence, a standard we accept."), rev'd on other grounds, 286 F.3d 1, 13 (1st Cir. 2002)." [*Id.* at 66]

55. The court in *Rubio* went further still:

> It is important to note, however, that Article 13(b) relief is not limited only to instances where repatriation poses the threat of physical harm. See Souratgar, 720 F.3d at 104. Rather, repatriation may also be inappropriate if it "pose[s] a grave risk of causing unavoidable psychological harm to the child." Id. (citing Blondin IV, 238 F.3d at 160-61). Thus, abuse directed at the respondent and witnessed by the child has been found to present a grave risk of harm to the child. The Second Circuit has recognized that "[m]any cases for relief under the Convention arise from a backdrop of domestic strife." Souratgar, 720 F.3d at 103. However, as this exception is to be interpreted narrowly, partner-respondent abuse "is only relevant under Article 13(b) if it seriously endangers the child." Id. at 103-04.

> In this vein, the Supreme Court has recognized that a mother might demonstrate "grave risk " to "her own safety" and thereby establish that "the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'" Abbott, 560 U.S. at 22 (citing Baran v. Beaty, 526 F.3d 1340, 1352-53 (11th Cir. 2008) and Walsh v. Walsh, 221 F.3d 204, 220-21 (1st Cir. 2000)). In Walsh, a First Circuit decision cited by the Supreme Court as an example of spousal abuse leading to a grave risk of harm to the child, there was ample evidence of severe spousal abuse

over an extended period and a well-documented history of violence and disregard for the law by petitioner. See Walsh, 221 F.3d at 209-12. The court must therefore ask "not whether repatriation would place the respondent parent's safety at grave risk , but whether so doing would subject the child to a grave risk of physical or psychological harm." Souratgar, 720 F.3d at 104. [*Id.* at 68-69]

56. In the instant case, Respondent has shown that Petitioner had been controlling, abusive and manipulative while they were together and while Petitioner lived in Colombia. At the very least, the attached documents show that a proper trial of fact need to take place to determine whether there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Therefore, the motion should be denied in its entirety or, in the alternative, set the matter for trial/evidentiary hearing to determine whether an exception applies in this case.

Dated: Long Island City, New York
      February 25, 2022

Respectfully Submitted,

_____
Roberto L. Pagan Lopez, Esq.
Pagan Lopez Law Office, PLLC
Attorneys for Respondent
28-07 Jackson Ave.
Tower Three Jackson, 5th Floor
Long Island City, NY 11101
347-434-3041 Office
646-490-2159 Fax
rpagan@paganlopezlaw.com
info@paganlopezlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

        NEIL J. SALTZMAN, ESQ.
        Attorney for Petitioner
        43 w. 43rd Street, Suite 52
        New York, NY 10036

Dated: February 25, 2022
      Long Island City, NY

                                          /s/ Roberto L. Pagan-Lopez
                                          Roberto L. Pagan-Lopez, Esq.
                                          PAGAN LOPEZ LAW PLLC
                                          28-07 Jackson Ave.
                                          Three Jackson, 5th Floor
                                          Long Island City, NY 11101
                                          347-434-3040  Fax: 646-490-2159
                                          rpagan@paganlopezlaw.com
                                          info@paganlopezlaw.com