UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 EDGAR HERNAN PARRA SAAVEDRA,

                    Petitioner,                **FINDINGS OF FACT &**
                                               **CONCLUSIONS OF LAW**
                                               21-CV-5418(EK)(VMS)
              -against-

 ALISON ESTEFFANY JIMENEZ MONTOYA,

                    Respondent.

------------------------------------x
ERIC KOMITEE, United States District Judge:

        Petitioner Edgar Hernan Parra Saavedra ("Petitioner")

and Respondent Alison Esteffany Jimenez Montoya ("Respondent")

are the parents of a minor child, M.P.J.  They are both

Colombian citizens, and M.P.J. was born in Colombia.  Respondent

brought M.P.J. to the United States in September 2020 and has

not returned to Colombia with the child since.

        Petitioner brings this petition under the Hague

Convention on the Civil Aspects of International Child

Abduction, seeking an order directing M.P.J.'s return to

Colombia.  Respondent concedes that she wrongfully removed the

child from Colombia and has retained him in the United States,

in violation of Petitioner's parental rights.  She opposes

M.P.J.'s return, however, on the ground that the child would

face a grave risk of harm if he were returned to Colombia.

After careful consideration, and for the reasons set forth in this Memorandum and Order, the Petition is granted, and the child is ordered returned to Colombia.

## I.   Relevant Procedural History

On September 29, 2021, Petitioner filed the instant action pursuant to the Hague Convention, requesting, among other relief, an order requiring Respondent to return M.P.J. to Colombia.  *See* Verified Pet., ECF No. 1.

On October 4, 2021, the Court issued an order directing Respondent to show cause why the Petition should not be granted.  Order to Show Cause 1, ECF No. 8.  The Court also prohibited Respondent from removing M.P.J. from the five boroughs of New York City and the counties of Nassau and Suffolk; directed Respondent to bring all travel documents for herself and for M.P.J. to the scheduled show-cause hearing; and authorized the United States Marshal to effectuate service on Respondent.  *Id.* at 2-3.

The proceeding was initially delayed by Petitioner's protracted difficulties in serving Respondent, which included numerous unsuccessful attempts to serve her at physical addresses in New York.  *See* ECF No. 15 (failed attempt by U.S. Marshal at address received from U.S. Department of State); ECF No. 16 (same); ECF Nos. 22, 24; Pet'r Hr'g Ex. 11, ECF No. 51-11 (failed attempt at New York address to which Petitioner had

2

mailed a package for M.P.J.).  Service was ultimately accomplished in February 2022 after the Court ordered service by alternative methods.  *See* Mem. & Order dated Feb. 8, 2022 at 2-3, ECF No. 26 (ordering service by, *inter alia*, the email address and WhatsApp number Petitioner used to communicate with Respondent); Aff. of Service, ECF No. 27.

On February 17, 2022, Respondent finally appeared, and the Court set an expedited schedule for an evidentiary hearing on the Petition.  *See* Docket Order dated Feb. 17, 2022, ECF No. 29.

The hearing took place over five days in May and September of 2022.[1]  The Court permitted witnesses who planned to appear to submit direct testimony in writing.  Order dated Mar. 29, 2022 at 1, ECF No. 38.  Petitioner and Miriam Sofia Atencio Gomez, a Colombian trial attorney retained as an expert witness, submitted testimony on behalf of Petitioner.[2]  Respondent and Jimmy Fernando Jimenez Meneses, also a Colombian attorney retained as an expert witness, submitted testimony on behalf of

---

[1] The evidentiary hearing was originally scheduled for early April 2022 but was adjourned until mid-May at the request of the parties.  *See* Minute Entry dated Mar. 31, 2022, ECF No. 40.  A continuation of the hearing, originally scheduled for July 25 and 26, was similarly adjourned at the parties' request until September 7, to facilitate the in-person testimony of their experts.  *See* Docket Order dated June 17, 2022; Docket Order dated July 22, 2022.

[2] Nadia Rubi Martinez, a Colombian trial attorney also retained by Petitioner as an expert witness, co-authored the report submitted on his behalf, but did not testify at the hearing.

Respondent.[3]  During the hearing, the Court allowed additional direct testimony from these witnesses, and each was cross-examined.  M.P.J. did not testify.  Neither party introduced any evidence from a clinical or forensic psychologist or other similar professional.[4]

Respondent and Petitioner submitted proposed findings of fact and conclusions of law after the hearing.  *See* Resp't Proposed Findings of Fact & Conclusions of Law ("Resp't Br."), ECF No. 147; Pet'r Proposed Findings of Fact & Conclusions of Law ("Pet'r Br."), ECF No. 149.  The Court heard oral argument on the post-hearing submissions on December 1, 2022, after which

---

[3] Respondent submitted written direct testimony from her mother, sister, and cousin.  *See* ECF Nos. 74, 74-1, 74-3.  Because these witnesses were not made available for cross-examination, the Court excluded their testimony. *See* Mem. & Order dated June 8, 2022 ("Mots. in Limine Order") 5-6, ECF No. 117.

[4] Several evidentiary issues that arose during the hearing warrant a brief discussion.  First, the parties did not individually admit their proposed exhibits during the hearing.  For the sake of efficiency, unless expressly objected to in motions in limine or during the hearing, the parties' exhibits were generally deemed admitted.  Second, and relatedly, both parties' exhibits and testimony contained various hearsay statements. The Court generally did not entertain individual hearsay objections during the hearing, but does not consider hearsay (or other inadmissible evidence) now in making findings of fact.  *See Williams v. Illinois*, 567 U.S. 50, 69-70 (2012) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. . . . There is a 'well-established presumption' that 'the judge [has] adhered to basic rules of procedure,' when the judge is acting as a factfinder.").  Third, the Court notes that both Respondent and Petitioner are native Spanish speakers, such that much of the parties' evidence is in Spanish.  Numerous submissions, however, did not include certified translations.  Some exhibits, for example, were translated by Meneses, Respondent's own lawyer and expert.  *See* Tr. 75:13-17.  The Court took a generous approach in accepting non-certified translations that were not specifically disputed or contradicted.  At the hearing itself, Respondent, Atencio Gomez, and Meneses all testified with the assistance of a Spanish interpreter.

the parties made supplemental submissions.  *See* ECF Nos. 157, 160, 161.

## II.  Findings of Fact

The Court makes the following findings of fact in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[5]  As a general matter, the Court credited witnesses' testimony according to their level of specificity: as noted below, detailed descriptions and particular examples were accorded more weight, while vague statements and generalizations were given less weight.

### A.  Petitioner and Respondent Meet and Begin a Relationship in 2011

Petitioner and Respondent met in Bogota, Colombia in about 2011, when Petitioner was eighteen years old and Respondent was forty-four.  Resp't Aff. 1:13–17, 2:1; Pet'r Aff. ¶ 5.  When the parties met, Respondent was working as a dancer and sex worker at a "strip club" in Bogota.  *Id.* at 1:13–17. Petitioner, who was married at the time, was a civil engineer. Tr. 246:7, 282:25–283:1.[6]  At the start of their relationship,

---

[5] Unless otherwise indicated, the following facts have been established by a preponderance of the evidence and are based upon the parties' direct testimony submitted prior to the hearing, *see* Aff. of Pet'r in Lieu of Trial Test. ("Pet'r Aff."), ECF No. 52; Aff. of Resp't ("Resp't Aff."), ECF No. 67; the parties' credible testimony contained in the hearing transcript ("Tr."), ECF Nos. 108, 109, 116, 132, 146; and evidence admitted in connection with the hearing.

Petitioner offered to support Respondent financially and to pay for her university studies if she agreed to quit her sex work, as well as any drug or alcohol use.  Resp't Aff. 1:20–21; Tr. 291:12–13.

Shortly after the start of their relationship, Respondent moved back to her hometown of Medellin, where Petitioner provided her with an apartment and covered other living expenses.  Resp't Aff. 2:4–9.  She described this as one of his "conditions" for their relationship.  *Id.*  Petitioner continued to reside primarily in Bogota.  Tr. 30:8–13.  He would visit her in Medellin approximately every eight days and stay for two or three days at a time.  *Id.*; Resp't Aff. 2:19–20.

1.  Evidence Concerning Petitioner's Physical and Verbal Abuse

During these first few years of their relationship, between 2011 and 2013, Petitioner engaged in what the Court can only characterize as antisocial (and likely illegal) behavior. Respondent asserted, and Petitioner did not deny, that he would frequently bring her to "strip clubs," "brothels," and "sex clubs" where he would engage in sexual acts with sex workers in front of Respondent.  Resp't Aff. 2:20–3:5.  According to

---

[6] Petitioner testified that he was an "independent civil engineer" who contracted with various oil and gas companies, and his work included building and maintaining pipelines.  *Id.* at 270:6–15; 277:7–24.  He estimated that he made roughly $400,000 U.S. dollars a year at this time.  *Id.* at 277:25–278:5.

Respondent, Petitioner would also bring cameras into these clubs — concealed in items like eyeglasses and keychains — to film such acts surreptitiously. *Id.* at 3:14–17; Tr. 52:5–53:9. Respondent testified that Petitioner showed her "some of the videos he took," including what she described as a "final presentation of those videos." Tr. 53:7–9.

During these visits to sex clubs, Petitioner would often become physically and verbally abusive toward Respondent. In her written testimony, Respondent asserted that Petitioner "would get drunk" and then "start[] to treat me awful[,] saying things like if I remembered where he got me from and that I was a worthless whore and a bitch." Resp't Aff. 3:6–8. Petitioner would then "grab[] me by the neck and start[] cho[king] me," and he "often bit me to the point of leaving marks and causing me extreme pain and discomfort. . . . Sometimes he would grab me by the arms so hard he would leave bruises all over." *Id.* at 3:8–11. At the hearing, Respondent similarly testified that when Petitioner became drunk, "he would treat me very badly," and it was "his bad habit to bite me frequently and choke me." Tr. 31:8–11. Respondent asserted that "[m]any times," other sex workers were "witnesses to these events," *id.* at 30:25–31:1, and they would "sometimes . . . leave the booth [at the strip club or brothel] running thinking that they were going to be strangled too." Resp't Aff. 3:11–13. She recalled at the

hearing that one such episode like this occurred at a hotel. Tr. 31:8–14.

Another biting incident occurred when Petitioner and Respondent were eating at a restaurant with Respondent's family. *Id.* at 35:22–36:6. According to Respondent, "all of a sudden," Petitioner started to bite her on her upper arm in front of her family. *Id.* at 35:22–36:6, 37:18–38:5. As discussed below, Petitioner admitted to this episode. *See id.* at 304:14–305:25.

Respondent also asserted that the two had "fights" and "altercations" at their Medellin apartment, which on "several occasions . . . [got] so heated that the neighbors would call the police." Resp't Aff. 5:1–2; *see* Tr. 42:7–9. She testified at the hearing to one of these incidents — a "stronger argument" that occurred just after they had returned from a brothel, during which Petitioner was "pushing," "grabbing," "biting," and "choking" her. Tr. 39:25–40:1, 41:14–42:1. In response, Respondent testified, she began packing her belongings to leave, prompting Petitioner to threaten to jump from the balcony of their seventh-floor apartment. *Id.* at 40:7–13. The police arrived, and Respondent ended up staying at her mother's house for two days before returning to the apartment. *See id.* at 40:13–20. No incident report or arrest was made for this or any other such incident. Resp't Aff. 5:5; *see* Tr. 141:21–25.

Respondent did not provide specific dates for these incidents, but testified that they occurred between 2011 and 2013.  Tr. 34:5-11, 35:12-16, 141:18-22.  She also testified that fights and arguments happened frequently during this period: roughly every week.  *See id.* at 42:14-16.

In his written testimony, Petitioner denied ever being "abusive or violent, physically or psychologically, toward Respondent."  Pet'r Aff. ¶ 47.  When asked by his counsel during the hearing about Respondent's allegations of abuse, however, Petitioner admitted to using physical force against Respondent on two specific instances.  He acknowledged that, "at the beginning" in 2011, "we ha[d] a fight" in which he was drunk and "over used [his] force."  Tr. 302:16-303:1.  Petitioner elaborated that during this incident, he "create[d] some bruises" by "hold[ing] her . . . with [his] hand" and also likely bit her.  *Id.* at 303:9-21, 304:7-10.  He also admitted to biting Respondent on her arm in front of her family during a dinner party.  *Id.* at 304:14-305:2.  Although he first explained that his purpose in biting her "wasn't to hurt," *id.* at 305:7, he acknowledged that it was some sort of outgrowth of an argument with Respondent prior to the dinner.  *Id.* at 305:12-25.  Petitioner also did not deny calling Respondent derogatory names such as "bitch" or "ho" but asserted that he "probably" did so

"in the same way that she has called me" names.  *Id.* at 306:8–11.

Based on the parties' testimony and evidence submitted at the hearing, the Court finds Respondent's assertions of Petitioner's physical and verbal abuse during the early years of their relationship to be credible.  The Court's finding here, however, is necessarily limited with respect to the frequency and severity of such abuse.  On the one hand, Respondent described certain specific episodes in some detail, as noted above.  When she did so, her testimony was sometimes corroborated by Petitioner's candid admissions concerning these specific events, even if he did not describe them precisely the same way.  As to these specific events, I credit Respondent's testimony in its entirety.[7]

At the same time, Respondent often generalized in her live testimony, indicating (for example) that "it was his habit, his bad habit to bite me frequently and choke me"; "every time we would go out . . . he would start mistreating me"; and "[t]his kind of thing happened frequently."  *Id.* at 30:24–25, 31:9–11, 42:6–7.  In support of this more general testimony, Respondent offered few, if any, specifics, despite ample

---

[7] The episodes that Respondent described in detail include the episode in which Petitioner bit her while they were at dinner with her family, as well as the altercation at their apartment which prompted Respondent to pack her belongings and leave.

opportunity to do so, and she introduced little or no corroborating evidence.

Respondent's assertions that Petitioner regularly "choked" and "strangled" her, in particular, are extremely concerning and refer to conduct that, by its nature, can cause serious injury or death.[8]  For these general allegations of choking, however, Respondent provided minimal insight into their severity; she did not, for example, testify that she could not breath or feared for her life, as might be expected of such events.  Other possible avenues to corroborate her testimony were either unavailable or not presented to the Court: Respondent did not testify, for example, to seeking medical treatment, nor did she submit any medical records or photographic evidence.  She acknowledged that she "never went to the authorities" in response to Petitioner's abuse during this time.  *See* Tr. 27:9-10, 178:6-11.

In the end, the Court finds that the specific instances of abuse to which Respondent testified were *not* the only such episodes during this time period.  Instead, her ability to recount these incidents with greater specificity

---

[8] The New York Penal Code, for example, provides very substantial penalties for the "obstruction of breathing," which a person commits when he "applies pressure on the throat or neck of such person" "with intent to impede [her] normal breathing."  N.Y. Penal Law § 121.11.  A person commits the felony offense of strangulation when he commits criminal obstruction of breathing and "causes serious physical injury" (first degree), or any "physical injury or impairment" (second degree).  *Id.* §§ 121.12, 121.13.

suggests that they were the most serious or otherwise impactful. The Court does, however, ascribe somewhat less weight to her more generalized testimony that Petitioner "frequently," "often," "like always," and "like usual" choked, bit, and pushed her.  Resp't Aff. 4:10, 7:4-6; Tr. 30:24-25.

> 2.   Evidence Concerning Petitioner's Coercive Control

Respondent also testified that Petitioner exerted "tremendous control" over her, including by monitoring her physical whereabouts and social interactions.  Resp't Aff. 2:7-14; Tr. 16:4-5.  Respondent testified, for example, that Petitioner tracked her location and accessed her communications on a phone that he insisted she use.  Tr. 47:18-24, 48:14-18. Petitioner, in turn, testified that they both used a "Family Locator" phone application to share their locations, *id.* at 281:5-16, and that reading each other's text messages was a "reciprocal" practice.  *Id.* at 292:21-25.

**B.   Petitioner and Respondent Begin to Live Together, and M.P.J. is Born**

The events described above generally transpired before M.P.J.'s birth, when Respondent lived in Medellin apart from Petitioner.  *See id.* at 34:5-11, 35:14-16, 141:21-22.  In approximately 2013, Petitioner and Respondent began living

together in Bogota.  *Id.* at 25:16–18.[9]  Petitioner paid the rent

for their shared residence and funded Respondent's educational

expenses at a local university, and he also provided her with a

car.  *Id.* at 105:20–106:4.

 The parties' testimony provides little specific

insight regarding their time in Bogota before M.P.J.'s birth.

Respondent testified generally that, after she moved to Bogota

and away from her family in Medellin, Petitioner continued his

abusive behavior and was able to exert even greater control over

her life.  Resp't Aff. 6:17–18; Tr. 50:5–8.  According to

Respondent, he controlled her movements, allowing her to leave

only to attend her university classes, and he did not permit her

to work.  Resp't Aff. 6:17–22; Tr. 105:10–12.  Respondent

testified that Petitioner "had absolute control" over her, and

she "had no social life."  Tr. 50:7–8.

 M.P.J. was born in August 2014.  Pet'r Aff. ¶ 6.

Respondent testified that she underwent an emergency cesarean

section.  Resp't Aff. 9:14–15.  Petitioner stayed with

Respondent during her labor and visited the hospital again the

day after delivery.  *Id.* at 9:15–17.  According to Respondent,

when she was discharged from the hospital two days later,

---

[9] Both parties acknowledge that they began a "de facto" marital union around this time, *see* Verified Pet. ¶ 8; Affirmation in Opp'n ¶ 2, ECF No. 31, although they presented no evidence regarding the legal import of that status under Colombian law, if any.

Petitioner dropped her and M.P.J. off at their apartment and then left. *Id.* at 9:16–21.  She testified that Petitioner did not support her or M.P.J. during the first months of the child's life. *Id.* at 10:2–4.  Instead, she was "left alone" to complete "all of the domestic chores" by herself; she eventually received help — not from Petitioner, nor any of her or Petitioner's relatives — but from staff members who worked in the apartment building. *Id.* at 10:5–11:2.

According to Respondent, after M.P.J.'s birth, Petitioner turned "aggressive and abusive" when she informed him that she would no longer "accompany him back to the brothels." *Id.* at 8:6–9.  In her written testimony, she testified that he "pushed [and] shoved me to the side" and "would grab me by the neck and strangle me as usual to shut me up whenever I was complaining or crying." *Id.* at 8:10–12.  Petitioner would also call Respondent derogatory names, telling her she was "worthless" and a "prostitute," "whore," and "bitch." *Id.* at 8:12–13.  Respondent did not testify to any specific physical altercations during this period at the hearing, and Petitioner denied that any incidents occurred after M.P.J. was born.  Tr. 306:3–7.  Consistent with the approach taken above, the Court ascribes somewhat less weight to these generalized accounts, but does not credit Petitioner's claim that the abuse ceased entirely after M.P.J.'s birth.

Respondent also testified that, to manipulate and control her, Petitioner "always" threatened to reveal her past involvement in sex work and drugs to her family and others. *Id.* at 50:24-51:2. This "blackmail," which began in 2013, became "even scarier" after M.P.J. was born. *Id.* at 51:2-5. According to Respondent, Petitioner would threaten that "he had everything on me" and "could use all that information" about her prior drug use and sex work to "take my son away from me." *Id.* at 106:10-15. Respondent testified that Petitioner would make these threats "every time [she] wanted to leave him." *Id.* at 106:8-15. Although Respondent never saw any "blackmail" videos or photographs depicting her, *id.* at 53:13-15, 109:5-24, she testified that Petitioner's videos of sex workers gave her reason to believe that Petitioner had similar materials involving her. *Id.* 53:7-12. Petitioner denied ever making any recordings of Respondent or threatening her in that way. *Id.* at 293:19-294:3. Instead, he testified to telling her that if she "ever [went] back to drugs, I will have to try my best to have the custody of my child." *Id.* at 293:25-294:3.

According to Respondent, Petitioner also used his ability to withhold consent for M.P.J. to travel with her as another means of control. Colombian law requires the non-traveling parent — here, Petitioner — to provide formal written

consent for a child to travel outside of the country.[10]
Respondent testified that, after her family moved to New York in
2014, it took "begging [Petitioner] for almost 2 years" for him
to allow M.P.J. to travel to the United States to see them.
Resp't Aff. 13:13–15.  Respondent and M.P.J., with Petitioner's
consent, were in the United States for approximately seven weeks
in August and September 2016.  *See* Pet'r Hr'g Ex. 7 at 2, ECF
No. 51-7; Pet'r Hr'g Ex. 8 at 2, ECF No. 51-8.

        Of her abusive encounters with Petitioner during this
period, Respondent recalled one from November 2017 in the
greatest level of detail.  According to Respondent, Petitioner
insisted that Respondent attend a Halloween "VIP event" with him
at the strip club where they had met.  Resp't Aff. 14:4–9.  Once
at the event, Petitioner had one of "his drunken psychotic
outbreaks against [her]," prompting Respondent to leave the club
and return home alone.  *Id.* at 14:9–11.  Petitioner arrived home
the next day, still drunk, and the parties had a "heated
argument" during which Respondent told him that she planned to
leave him.  *Id.* at 14:11–13.  Respondent testified that
Petitioner was "[p]ushing and shoving [her] during the

_____

        [10] Specifically, Article 110 of Colombia's Code on Parental Authority,
Custody Rights and Alimony requires a child leaving Colombia with only one
parent to formally "obtain the permission" of the non-traveling parent.  *See*
Verified Pet. Ex. G at 5, ECF No. 1-7.  That permit must include the
destination, the purpose of the trip, and the dates of travel.  *See id.*

argument," and it became "so extreme that the neighbors had to call the police," who arrived to "deescalate the situation." *Id.* at 14:13-18.  During the argument, Respondent testified, Petitioner threatened to withhold his consent for M.P.J. to travel with Respondent to the United States as planned the following week.  *Id.* at 14:14-16.  At this, Respondent then "calmed [Petitioner] down to avoid his retaliation with the travel permit," and Petitioner ultimately provided his consent. *Id.* at 15:1-3.

Respondent's written direct testimony did not mention Petitioner ever using physical force against their son.  At the hearing, however, Respondent testified to a specific incident in which Petitioner "slapped" M.P.J. when he was "still in diapers."  Tr. 55:8-25.  On this occasion, the child "acted out because he wanted something."  *Id.* at 55:15-16.  According to Respondent, Petitioner directed her to leave the room, "so as not to see what he was going to do"; he then took off M.P.J.'s diaper and slapped his hind side.  *Id.* at 55:14-25, 56:19-57:7. While she was not in the room to witness the slap, Respondent testified that afterwards, she saw M.P.J. "crying" and further observed "color" and a "hand mark" on his rear.  *Id.* at 57:1-6, 116:1-2.

Relatedly, Respondent produced virtually no evidence that M.P.J. witnessed his father physically or verbally abusing

his mother.  Respondent was questioned at the hearing about whether the child had been exposed to her physical or other abuse by Petitioner.  Asked whether M.P.J. had witnessed any of the "acts of violence" against her, Respondent responded, "Yes, but he was a baby and he doesn't remember."  *Id.* at 59:25–60:3. She further testified that, when living in Colombia, her son did not witness any of her reactions to incidents with Petitioner; when they happened, she "always tried for [her] son never to realize what was going on."  *Id.* at 63:22–64:2.  Her written direct testimony also omits any mention of the effect that Petitioner's behavior toward her had on M.P.J.[11]

Respondent's written testimony also omitted any indication that she went to the Colombian authorities to report any abuse after M.P.J. was born.  At the hearing, however, Respondent testified to making numerous attempts to lodge complaints against Petitioner with the police, as well as with the Instituto Colombiano de Bienestar Familiar ("ICBF"), a child services administrative agency, and the Comisaria de Familia ("Comisaria"), a separate administrative body tasked with

---

[11] At the hearing, Respondent explained this omission as the result of working through an "awful lot of information" against a deadline.  *Id.* at 90:4–7.  Given that evidence regarding the effects that Petitioner's abuse had on M.P.J., if any, goes to the heart of the grave risk defense, the Court finds this explanation unconvincing.

protecting victims of intrafamily violence.[12]   Tr. 20:17–20,
23:13–25:1, 179:2–7.   According to Respondent, she went to the
ICBF in 2015, *see id.* at 20:10–14, and to the Comisaria once in
2015 and then two additional times in early 2018.   S*ee id.* at
24:22–25:1.   Respondent testified that these agencies "never
paid attention to [her]" or provided any formal assistance; her
visits also did not result in any complaints or proceedings
relating to Petitioner.   *Id.* at 15:15–17, 54:20–25, 178:22–
179:22.   Respondent's testimony on her attempts to seek help
from the Colombian authorities was high-level at best; for none
of these instances did she specify when she went, to whom she
spoke, or what specifically she went to report.   She also
produced no paperwork, created during or reflecting the contents
of, these alleged interactions.

C.   **Petitioner and Respondent Separate in Early 2018 and Share Custody of M.P.J.**

        In or around early 2018, Respondent broke off the
relationship, and Petitioner moved out to a separate residence.
Pet'r Aff. ¶ 7; Tr 25:3–4.   Despite Petitioner's apparent
threats to reveal information about Respondent's past if she
were to leave him, she acknowledged that "no embarrassing
publications or any other kind of consequences" resulted from

_____

        [12] The powers and responsibilities of the Comisaria, as explained by the
parties' experts, are discussed in greater detail below.   *See infra* Section
II.E.

this separation.  Tr. 106:8–25.  Instead, Respondent testified,

Petitioner continued to use "blackmail" to set the conditions of

their separation.  Resp't Aff. 16:13–17:9.  Respondent did not

testify to any incidents of physical or verbal abuse from

Petitioner after the two separated.

The parties never established a formal custody

arrangement for M.P.J.  Tr. 97:18–21.[13]  Nevertheless, they

shared custody according to a consistent schedule: M.P.J.

primarily lived with Respondent.  Every two weeks, Petitioner

would pick up M.P.J. on Saturday in the early afternoon and drop

him off with Respondent on the following day (Sunday) in the

evening.  *Id.* at 98:3–5.  The parties also equally shared

"vacation periods for the child."  *Id.* at 98:6–8.  Under this

arrangement, Petitioner saw M.P.J. for approximately sixty days

a year.  *Id.* at 97:12–13.  Respondent testified that Petitioner

dictated these terms as "he wanted," *id.* at 97:19–21, but she

did not present evidence indicating that she sought, formally or

informally, any alternative arrangement.  Nor did Respondent

testify to any incidents with Petitioner, involving herself or

M.P.J., in connection with his visits with the child.  Instead,

---

[13] In his Hague Convention application submitted to the ICBF, Petitioner represented that in July 2018, he sent documents "prepared by a lawyer to formalize" the end of their "de facto" union and "the responsibilities of the parties with our child," but "did not get any formal answer."  Pet'r Hr'g Ex. 5 at 6, ECF No. 51-5.

the parties apparently followed this visitation schedule without incident.

During this period, Petitioner continued to support Respondent and M.P.J. financially.  He paid the rent and utility bills for the apartment to which Respondent and M.P.J. moved.  *Id.* at 143:1-3, 313:2-3.  He also arranged and directly paid for M.P.J.'s education, health insurance, and medical care, *see* Pet'r Aff. ¶ 9, Tr. 313:11-15, and gave Respondent a car to use and money for additional expenses.  Pet'r Aff. ¶ 47.  Respondent acknowledged that Petitioner provided financial support, but again testified that Petitioner forced her into a position of economic dependence and used it to maintain control over her after their separation.  Resp't Aff. 16:13-20; Tr. 142:22-143:6, 227:13-19.[14]  Petitioner, in turn, asserted that she "had complete control of her time and activities."  Pet'r Aff. ¶ 47.

Respondent's testimony on this point stood in tension with her other acknowledgments: that she had opportunities to work and receive money, for example, from sources other than Petitioner.  Shortly after their separation, Respondent received a job offer to work as a secretary for a trash collection company in Bogota, although she did not accept the position

_____

[14] At the same time, however, Respondent appeared to dispute the extent of this support, testifying that she went through "financial struggles" in 2020 during the COVID-19 pandemic.  Resp't Aff. 18:12-19:4.

because she could not arrange childcare for M.P.J.  Tr. 215:16–
216:25.  Around the end of 2018, Respondent and a friend created
a small business on Instagram that sold nuts, which provided
"enough [income] to pay for my son's expenses."  *Id.* at 218:2–
16.  Respondent's family in the United States would also send
her money, a practice that began when she was "still with"
Petitioner.  *Id.* at 218:18–22.

Between 2018 and 2020, moreover, Respondent traveled
outside Colombia on numerous occasions, often leaving M.P.J.
with Petitioner for days or weeks at a time.  She visited the
United States for five days in August 2018, for seven weeks from
November to December 2018, and for another seven weeks from June
to August 2019.  Pet'r Hr'g Ex. 7 at 2.  Respondent also took a
four-day trip to Barcelona in December 2019, which her father's
family funded, and a weekend trip to Mexico in January 2020,
which she paid for herself.  Tr. 220:4–221:7.  Of her travels,
M.P.J. accompanied Respondent on only one — her 2019 trip to the
United States.  *See id.* at 219:16–18; Pet'r Hr'g Ex. 8 at 2.[15]
For the rest, the child stayed with Petitioner.  Tr. 96:16–97:1,

---

[15] Respondent testified that she wanted to bring M.P.J. on the seven-
week trip to the United States in late 2018, but Petitioner refused to
authorize M.P.J. to travel, as required by Colombian law.  Resp't Aff. 17:15–
16.  She acknowledged, however, that she then "decided to leave him with
[Petitioner] during Christmas as it was his turn to spend Christmas with the
child."  *Id.* at 17:16–17.

22

147:5-20.  Respondent did not testify to any concerns in leaving their son with Petitioner for extended periods of time.

During this time, Respondent also maintained an on-again, off-again, long-distance relationship with a U.S.-based individual named Ryan Portela.  *Id.* at 158:20-21; Resp't Aff. 17:10-11.  Respondent spent time with Portela during her trips to the United States, and Portela visited Respondent in Colombia twice, in May and October 2018.  Resp't Aff. 17:12-18:9.  Respondent herself testified that Petitioner "knew nothing about [her] private life" during this period.  *See id.* at 19:20-20:2.

## D.  Respondent and M.P.J. Travel to the United States in September 2020 and Do Not Return

In September 2020, Respondent traveled with M.P.J. to the United States.  According to Respondent, her mother's family had sent her money for this travel, given the "complicated" situation during the COVID-19 pandemic and her ongoing "financial struggles."  *Id.* at 18:16-18.  Petitioner provided his written consent authorizing M.P.J. to leave the country with Respondent from September 2, 2020 to October 7, 2020.  Pet'r Hr'g Ex. 12, ECF No. 51-12.  Due to disruptions in airline flight schedules caused by the pandemic, the departure was delayed until September 19, 2020.  Pet'r Aff. ¶ 15.

Respondent and M.P.J. did not return to Colombia in October as scheduled.  Respondent originally told Petitioner

that their flight home had been cancelled and would need to be rescheduled.  *See* Pet'r Aff. ¶ 16; Resp't Hr'g Ex. E at 6, ECF No. 45-5.  Petitioner apparently accepted this explanation, and Respondent and M.P.J. remained in the United States for weeks after their anticipated return to Colombia.  During this time, unbeknownst to Petitioner, Respondent enrolled M.P.J. in a school in New York.  Resp't Aff. 19:17–18.  Respondent also became engaged to Portela, and the two were married in early December 2020.  *Id.* at 19:15–20.

In a series of text messages sent on December 12 and 13, 2020, Petitioner asked Respondent when she planned to reschedule M.P.J.'s return.  Resp't Hr'g Ex. E at 2–4.  In response, Respondent informed Petitioner for the first time that she intended to remain in the United States with the child.  Pet'r Hr'g Ex. 3 at 3, ECF No. 51-3.  Among other text messages, Respondent wrote:

> Now I am telling you something Edgar, I will never take away the right that you have as [M.P.J.'s] Father to see him and share time with him, off [sic] course not.  But seeing this entire economic situation in which we have to live over there in Bogota, which is not good and that all these years I have to count coins all the time and now is worst with this virus. I have decided to live here (USA). [M.P.J.] already has a school. He is studying and happy. I already have a Health insurance here. And I have already submit my papers (immigration documents) This means very soon [M.P.J.] is going to be legal. And I see no reason why we should not give ourselves this opportunity in this country. We are doing fine, thanks to God I am studying and I am working or what were you thinking?

> That all this time I have been doing nothing. That my
> family is taking care of me, No I have a son and I am
> willing to go ahead and I will not allow that your
> stubbornness and selfishness will stop me, that
> everything has to be done as you say.

*Id.*[16]  Respondent proposed a visitation schedule for Petitioner to see M.P.J. — during his summer vacations — that would be roughly equal in aggregate time to the parties' prior schedule. Resp't Hr'g Ex. E at 9–10.

    1.    <u>Petitioner's Attempts to Locate M.P.J.</u>

        Petitioner then began to take steps to secure M.P.J.'s return to Colombia.  In January 2021, Petitioner prepared and filed an application (the "Hague Application") with the ICBF, the Colombian Central Authority for the Hague Convention.[17]  *See* Pet'r Aff. ¶ 24; Pet'r Hr'g Ex. 5.  In the application field for the "place where the child is thought to be," Petitioner listed an address in Queens, New York that he had looked up on Google

----

[16] Petitioner argues that this text message confirms that Respondent decided to stay in the United States for economic reasons.  Pet'r Br. ¶ 59. For obvious reasons, it is not necessarily inconsistent with the fact of domestic violence that a victim would cite a more innocuous reason for leaving in communications with her abuser.  Accordingly, the Court declines to read the significance that Petitioner ascribes into this text exchange. At the hearing, Respondent testified that while "[t]here were financial problems," the "principal motivation was that [her] entire family lives here" in the United States.  Tr. 151:5–15.  Moreover, the conclusion of the message clearly refers to Petitioner's efforts at control and coercion.

[17] U.S. Dep't of State, *Colombia International Parental Child Abduction Information*, Travel.State.Gov, https://travel.state.gov/content/travel/en/ International-Parental-Child-Abduction/International-Parental-Child-Abduction-Country-Information/Colombia.html (last visited Apr. 12, 2023).

Maps after "[M.P.J.] shared his [W]hatsapp location."  Pet'r
Hr'g Ex. 5 at 3.

Around the same time, Respondent's relationship with
Portela deteriorated.[18]  Respondent testified that on February 8,
2021, Portela beat and strangled her, causing her to flee their
residence with M.P.J., seek treatment at a hospital for her
injuries, and file a complaint against Portela with the New York
Police Department.  Resp't Aff. 21:4–22:7.  Respondent asserted
that Petitioner told Portela "about [her] past as a prostitute
or sex worker," prompting Portela to attack her.  *Id.* at 23:3–5.
Petitioner disputes that he had anything to do with this
incident.  Pet'r Aff. ¶ 56.  He testified that he received a
call "from an American guy" — Portela — after the February 8
episode of violence, on February 10, 2021.  Tr. 296:22–25.
According to Petitioner, he had never before communicated with
Portela and did not know of his existence or relationship with
Respondent prior to this contact.  Pet'r Aff. ¶¶ 52–53.  The
record on this issue is murky at best, and the Court cannot
conclude, based on the evidence presented, that Petitioner bears
any responsibility for Portela's actions.

---

[18] The Court previously excluded, on relevance and other grounds,
evidence offered by both parties relating to civil and criminal proceedings
involving Portela.  *See* Mots. in Limine Order 7–14.  The Court recites here
only those facts regarding Portela that are relevant to this instant action.

Also on February 10, Respondent and Petitioner exchanged text messages regarding the incident with Portela. Pet'r Hr'g Ex. 6 at 5–6, 8, ECF No. 51-6.  Petitioner testified that these communications — including Respondent's account of Portela's attack and what he understood to be her suggestion that she might leave the United States for Barcelona — prompted him to file an additional "[urgent] request" with the ICBF, to prevent M.P.J. from leaving the United States.  *Id.* at 1; Pet'r Aff. ¶¶ 26–27.  Despite any initial concerns regarding Portela and the danger he posed to M.P.J., Petitioner continued to communicate with him through text messages and phone calls over the following weeks, as Petitioner sought Portela's "cooperat[ion]" to "bring back [his] son."  *See* Resp't Hr'g Ex. H, ECF No. 45-8.[19]

In the days following, Petitioner created a Google Sites webpage and posted information about his history with Respondent and current separation from M.P.J.  Tr. 298:21–24; Pet'r Aff. ¶ 36; *see* Resp't Hr'g Ex. CI, ECF No. 95; Resp't Hr'g Ex. CI-T, ECF No. 103.  He shared a link to the site with five

---

[19] In text messages exchanged on February 11, Portela confirmed, as Respondent and M.P.J.'s location, the Queens address that Petitioner had included in his Hague Application.  Resp't Hr'g Ex. H at 8; *see* Tr. 329:10–25.  Petitioner testified, however, that he was not confident in this information, and it later proved to be incorrect.  Tr. 358:4–361:9.

individuals he understood to be relatives of Respondent.  *See* Tr. 306:18–307:1.[20]

The parties disagree vigorously about the purpose of this website.  Petitioner testified that, at this time, Respondent was refusing to reveal M.P.J.'s whereabouts, and the ICBF, working with the U.S. Department of State, still had not located M.P.J.  Pet'r Aff. ¶ 35; Tr. 297:15–22.  This lack of information, together with his February communications with Portela and Respondent, caused Petitioner to become "extremely concerned about [his] son's safety."  Pet'r Aff. ¶ 35. Petitioner therefore put together the website, he testified, to convey the risks that he believed M.P.J. was facing and to appeal to others for help in locating him.  Pet'r Aff. ¶¶ 35–36; Tr. 301:14–24.

Respondent asserts that the website's contents, described in greater detail below, belie Petitioner's stated intentions.  Tr. 135:12–20.  Instead, Respondent argues, in publishing the website, Petitioner finally followed through on

---

[20] In his written testimony, Petitioner indicated that he sent the link to four relatives, Pet'r Aff. ¶ 37, but he identified five relatives when testifying at the hearing: Respondent's uncle, aunt, grandmother, cousin, and ex-brother-in-law.  Tr. 306:18–307:1.  Respondent testified that her sister and brother-in-law had been separated for a long time, and that the brother-in-law was an outsider to her family. *See id.* at 229:1–11.  Respondent also acknowledged, however, that she had never told Petitioner about her sister's relationship ending, *see id.* at 230:3–25, and Petitioner testified that he did not know. *See id.* at 300:1–9.

his threat to reveal information about her past.  *Id.* at 87:2–
11.

Petitioner testified that the webpage was "private"
and "unsearchable on the web," Pet'r Aff. ¶ 36, and that he
could control access to the page by sharing and deleting a link
accordingly.  Tr. 340:11–16.  Specifically, according to
Petitioner, he generated and sent a unique link for the webpage
to certain of Respondent's relatives, one at a time, with
accompanying messages requesting their help to locate M.P.J.
Pet'r Aff. ¶ 37; Tr. 298:18–299:25.  Petitioner would leave each
link open for a short period — he initially indicated one day,
but at the hearing testified two to four days — waiting for the
relative to reply.  Pet'r Aff. ¶ 37; Tr. 299:12–25.  If no
response came, he would disable the link and send a new one to a
different relative.  Pet'r Aff. ¶ 37; Tr. 299:18–25.

However much Petitioner intended to limit access to
the webpage to its direct recipients, his efforts were not
successful.  Respondent testified that *she* ultimately received a
link, through which she accessed the webpage, and that many
members of her family had seen the site.  Tr. 67:12–17, 126:12–
14.  She also disputed Petitioner's suggestion that deleting the
link disabled access to the site, asserting that Petitioner kept
the site open.  *Id.* at 185:23–186:1.

Petitioner's testimony that his only purpose in creating and circulating the website was to locate M.P.J. cannot be credited.  While the webpage contains some details about the Petitioner's efforts to return M.P.J., the lion's share of the content relates to Respondent's past drug use and involvement with sex work, as well as her then-ongoing situation with Portela.  *See* Resp't Hr'g Ex. CI; Resp't Hr'g Ex. CI-T.  The content further suggested that Respondent had committed various crimes and moral wrongs, including immigration fraud and human trafficking.  *Id.*  The website includes, among other things, pictures of Respondent taken when she was eighteen years old, *see* Tr. 346:14-347:8,[21] as well as several years-old audio recordings of Respondent. *See id.* at 347:11-348:11.[22]  According to Petitioner, he believed that Respondent was, at the time he posted the site, involved in "dangerous drug and prostitution activity," and therefore this information was "relevant" to M.P.J.'s safety.  Pet'r Aff. ¶ 36.  He offered no explanation,

---

[21] Nothing on the face of these pictures conveys Respondent's involvement with sex work, although its surrounding text so indicates. Resp't Hr'g Ex. CI; Resp't Hr'g Ex. CI-T; *see* Tr. 86:15-87:18.  The text immediately before one image, for example, asserted that Respondent was underage when she began "to perform activities of prostitution" and referred to the picture as evidence of "her innocence."  Resp't Hr'g Ex. CI-T at 4.

[22] These audio recordings purport to demonstrate Respondent's "drug addiction problems" at the time.  Resp't Hr'g Ex. CI-T at 5.  Petitioner testified that Respondent herself had published one of these audio recordings.  Tr. 348:17-19.  For the other recording, Petitioner claimed that Respondent had borrowed his phone, on which he had installed on it an application to one-way record only his side of the conversation during phone calls.  *Id.* at 347:11-348:16.

however, as to how these decade-old pictures or audio files, or
purported information about Respondent's distant past, might
convey the urgency of the present situation or help him locate
his son.  Indeed, Petitioner testified himself that it had been
"more than 10 years" since he had last observed Respondent under
the influence of drugs.  Tr. 289:25–290:11.

      2.   <u>Respondent's Colombian Proceedings Against Petitioner</u>

        In May 2021, Respondent's retained Colombian counsel
filed a formal request with the Comisaria seeking a "protection
measure" against Petitioner.  *See* Affidavit of Jimmy Fernando
Jimenez Meneses ("May 24, 2022 Meneses Aff.") 1:3–9, ECF No.
102.  Respondent's complaint included, among other exhibits,
witness statements from two laundry employees who worked in the
Bogota apartment building in which the parties had lived.  Tr.
251:10–14; Resp't Hr'g Ex. CXI-T, ECF No. 119-21.  On June 4,
2021, Petitioner received a notice from the "Comisaria de
Familia Number 2 Usaquen," advising him that Respondent had
filed the request for a protection measure and that such request
had been rejected for "lack of jurisdiction," given Respondent's
current "domicile[]" in the United States.  Pet'r Hr'g Ex. 14,
ECF No. 72-14; Tr. 250:7–23.  The notice also indicated that
this would be "communicate[d] . . . to the attorney general of
the nation for its knowledge and competency."  Pet'r Hr'g Ex. 14
at 4.  Petitioner testified that he was not aware Respondent had

made a protection request until he received this notice.  Tr.
250:14-23.

        After that, Petitioner went to the Comisaria and asked
to review any complaints against him.  *Id.* at 250:25-251:4.
Surprisingly, at least from the perspective of U.S.-trained
lawyers, he was granted access to the Comisaria's file,
including the witness statements attached to Petitioner's
request.  *Id.* at 251:4-14.  Afterwards, Petitioner went to the
apartment building where the laundry-employee witnesses worked,
*id.* at 251:16, ostensibly to ask the security guard there — who
knew him "very well" from when they lived in the building — to
make a statement on his behalf for use in these proceedings.
*Id.* at 254:16-24.  The laundry employees who had given
statements were not there at the time.  According to Petitioner,
the security guard offered to explain the "situation" to these
employees, and Petitioner offered to return the following day if
they wished to speak with him.  *Id.* at 252:3-8, 253:1-6, 256:1-
257:1.  The laundry employees did not reach out, however, so he
never went back to the apartment building.  *Id.* at 253:11-12.[23]
In response to Respondent's suggestion of impropriety,
Petitioner denied ever threatening the laundry-worker witnesses

_____

        [23] Petitioner went on to testify that one of the laundry workers called
him several weeks later, and they had a brief five-minute conversation.  *Id.*
at 262:2-17, 265:5.  This was the only communication between him and the
employee.  *Id.* at 265:6-13.

or suggesting that the security guard should pressure or intimidate them in any way. *Id.* at 253:6-20.

Respondent subsequently filed a "domestic violence complaint" against Petitioner with the Colombian general prosecutor's office. *Id.* at 549:5-15. This complaint alleged various crimes, including domestic violence and slander. *See* Resp't Hr'g Ex. CII-T, ECF No. 119-3.[24] Respondent also submitted a "right of petition" to the prosecutor's office, requesting an investigation into Petitioner's access to the Comisaria's file. *See* Aff. of Jimmy Fernando Jimenez Meneses ("June 17, 2022 Meneses Aff.") 3:14-18, ECF No. 120. The record does not reveal whether or how these concluded. *See* Tr. 582:12-14.

**E.   Colombian Law Experts' Opinions**

Both Petitioner and Respondent called experts to opine on the legal system in Colombia and the protections available to victims of domestic violence. Petitioner submitted a report prepared by Nadia Rubi Martinez and Miriam Sofia Atencio Gomez, the latter of whom testified during the evidentiary hearing. Pet'r Expert Aff., ECF No. 53. Atencio Gomez is a Colombian

---

[24] In his written testimony, Meneses stated that a criminal complaint was filed on September 27, 2021. June 17, 2022 Meneses Aff. 1:26-27. During the hearing, however, he indicated that the reference to a "September" complaint was a mistake, and that only one criminal complaint had been filed. Tr. 551:2-18.

trial attorney who has represented parties in criminal cases, divorce proceedings, and child support matters. *See* Atencio Gomez Curriculum Vitae, ECF No. 53-1.  At the hearing, she testified that she had experience with intrafamily violence through her work on divorce matters.  Tr. 432:5–8.  Respondent submitted statements prepared by Jimmy Fernando Jimenez Meneses, a litigator specializing in family law, who also testified.  May 24, 2022 Meneses Aff.; June 17, 2022 Meneses Aff.; *see* Meneses Curriculum Vitae, ECF No. 102-1.  At the time of the hearing, Meneses was also serving as Respondent's counsel in Colombia in connection with the filings she made against Petitioner.

Much of the experts' testimony was irrelevant or inadmissible, including because it contained hearsay relating to factual matters or concerned topics about which the expert was not qualified to testify.  Ultimately, for the reasons set out below, the Court need not draw any conclusions here regarding the effectiveness of the Colombian legal system.  Nevertheless, for the sake of completeness, the Court briefly reviews the most salient aspects of their testimony.

Both sides' experts agreed on the broad contours of Colombian law regarding domestic violence.  In Colombia, the procedures and remedies regarding domestic violence are governed by both criminal and civil law.  Many such laws, including those setting out the rights and protections for children, are

34

summarized in Petitioner's expert report.  *See generally* Pet'r
Expert Aff.

In the criminal context, the crime of domestic
violence covers physical or psychological abuse perpetrated
against any "member of [the] family nucleus" and certain other
individuals.  *Id.* at 14.  For example, abuse against a permanent
partner, even if the partners have separated, as well as abuse
by a father or mother directed against the other parent, even
when they do not live in the same home, is also criminal.  *Id.*
A criminal investigation can be initiated either by a
complainant or on the Colombian authority's own accord.  *Id.*

In the civil or administrative context, a victim may
seek a "protection measure" or "order of protection" from the
Comisaria.  *Id.* at 11.  The experts differed concerning the
types of protection measures available, as well as the
consequences of a breach.  Petitioner's expert report sets out
various measures that the Comisaria may order, including the
assailant's eviction from a shared home and restraint from
entering any place where the victim is known to be.  *Id.*
Meneses, however, testified that Colombia does not issue orders
of protection that require one party to keep a certain distance
from the other.  Tr. 564:14-20, 568:23-569:2.  Petitioner's
experts also indicated that a first-time violation of an
existing protection measure was sanctioned by fine, but an

arrest would occur for non-payment of the fine or a second violation.  Pet'r Expert Aff. 13.  Meneses testified that noncompliance with a protective measure was not a crime and may only be sanctioned with a monetary fine "in some cases."  Tr. 564:21–565:2, 569:3–5.  Both experts agreed, however, that a request for a protection measure must be filed within thirty days after the catalyzing incident of domestic violence.  *See* Pet'r Expert Aff. 11; Tr. 583:7–16.

The parties' experts also diverged on their bottom-line assessments of Colombia's legal system in this context.  On behalf of Petitioner, Atencio Gomez expressed confidence in the Colombia's ability to protect domestic-violence victims.  *See* Tr. 592:13–16.  She opined that it would be "unusual" for Respondent to have gone to the Comisaria on several occasions — as Respondent testified she did during her relationship with Petitioner — and not have her complaints heard and investigated.  *See id.* at 592:16–593:3.  For Respondent, Meneses acknowledged that there were "plenty" of Colombian laws, but characterized the legal system as a "disaster" in its overall efficacy; "in practice, [the system is] deficient when it comes to enforcement," and "there are serious legal voids" that undermine its effectiveness.  *See id.* at 528:10–21, 571:20–21, 577:12–15.  He identified, as one such "void," the legal bar that prevents victims from seeking a protective measure more than thirty days

36

after the incident of domestic violence.  *Id.* at 583:4–16.

Another such "void," according to Meneses, relates to

Petitioner's ability to access the Comisaria's file on

Respondent's request for a protective measure against

Petitioner.  *Id.* at 586:7–13.

### III. Conclusions of Law

The Hague Convention, as implemented by Congress

through the International Child Abduction Remedies Act, is

"designed to protect children internationally from the harmful

effects of their wrongful removal by establishing procedures to

ensure their prompt return to the State of their habitual

residence."  *Souratgar v. Lee*, 720 F.3d 96, 101–02 (2d Cir.

2013).[25]   Colombia is both a party to the Hague Convention and a

treaty partner with the United States.[26]

---

[25] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

[26] Article 4 of the Hague Convention provides that "[t]he Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights."  Hague Convention art. 4, Oct. 25, 1980, 1343 U.N.T.S. 89.  When a country accedes to the Hague Convention, a Contracting State — *i.e.*, a country who had previously ratified or acceded to it — must formally agree to, or "accept," that accession before a treaty partnership between the two countries is created.  *See* Hague Convention art. 38 ("The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession.").  The United States ratified the Hague Convention in 1988 and accepted Colombia's 1995 accession to the treaty on June 1, 1996.  *See* Convention of 25 October 1980 on the Civil Aspects of International Child Abduction: Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Apr. 12, 2023); U.S. Dep't of State, *U.S. Hague Convention Treaty Partners*, Travel.State.Gov, https://travel.state.gov/content/travel/en/International-

Under ICARA's burden-shifting framework, a petitioning party must first establish, by a preponderance of the evidence, that the child was "wrongfully removed or retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1)(A).  The removal of a child is "wrongful" under the Convention when "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal."  *Souratgar*, 720 F.3d at 102.  Once the petitioner establishes a wrongful removal, "the child *must be returned* unless the [respondent] can establish" one of the exceptions set out in the Convention.  *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999); *see* 22 U.S.C. § 9003(e)(2).  One such exception, discussed in detail below, applies when the child would face a grave risk of harm upon his return.  *Souratgar*, 720 F.3d at 102.

Importantly, the Court cannot consider "the merits of the underlying custody claim."  *Blondin*, 189 F.3d at 246.  Determinations regarding "who is the better parent," for example, "remain within the purview of the court with plenary jurisdiction over the question of custody."  *Id.*  Any custody-like ruling "would frustrate a paramount purpose" of the Convention — namely, "to preserve the status quo and to deter

---

Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Apr. 12, 2023).

parents from crossing international boundaries in search of a more sympathetic court." *Id.* Instead, the "focus is simply upon whether a child should be returned to [his] country of habitual residence for custody proceedings." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012).

The unavoidable import of this framework is that children will, pursuant to the Convention, often be returned to suboptimal circumstances — including exposure to a parent who has engaged in bad behavior — if that bad behavior does not rise to the level of grave risk to the child.

A.    *Prima Facie* **Case of Wrongful Removal**

To establish his *prima facie* case, Petitioner must demonstrate, by a preponderance of the evidence, that: (1) M.P.J. was habitually resident in Colombia and has been removed to or retained in the United States; (2) his removal or retention was in breach of Petitioner's custody rights under Colombian law; and (3) Petitioner was exercising those rights at the time of M.P.J.'s removal or retention. *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005). The parties stipulated and agreed that Petitioner has established his *prima facie* case under the Hague Convention. *See* Proposed Joint Pretrial Order 3–4, ECF No. 78; Resp't Br. 14 ("Respondent early on in this matter conceded that Petitioner had met their *prima facie* case for their petition.").

The Court likewise finds these elements satisfied. First, M.P.J. was a habitual resident of Colombia: he was born there and continued to reside there until he traveled with Respondent to the United States on September 19, 2020.  Second, Petitioner was exercising his custodial rights, including his parental right to consent before a child leaves the country — known in this context as a *ne exeat* right — by formally authorizing M.P.J.'s travel outside of Colombia.  *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010) (holding *ne exeat* rights are a "right of custody" under the Hague Convention).  Finally, Respondent's refusal to return M.P.J. to Colombia since they left in September 2020, in violation of the limited-duration travel authorization Petitioner executed for that trip, contravened Petitioner's custodial rights protected by the Hague Convention.  *See, e.g.*, *In re R.V.B.*, 29 F. Supp. 3d 243, 254 (E.D.N.Y. 2014); *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *18 (E.D.N.Y. Oct. 15, 2019), *aff'd*, 813 F. App'x 619 (2d Cir. 2020).

Because Petitioner has established his *prima facie* case of wrongful retention, the child must be returned to Colombia unless Respondent can establish that one of the Hague Convention's affirmative defenses applies.

**B.    Respondent's "Grave Risk" Defense under Article 13**

Respondent invokes only such one defense: Article 13's "grave risk of harm" exception.  Under Article 13(b), a signatory state "is not bound to order the return of the child if [the party opposing repatriation] establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Souratgar*, 720 F.3d at 102. "The respondent parent opposing the return of the child has the burden of establishing by clear and convincing evidence that one of the exceptions set forth in [A]rticle 13b . . . of the Convention applies."  *Id.* at 103; *see* 22 U.S.C. § 9003(e)(2). Individual subsidiary facts, however, "may be proven by a preponderance of the evidence." *Souratgar*, 720 F.3d at 103.

As relevant here, a grave risk of harm exists only "in cases of serious abuse or neglect" of the child, "when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.* (emphasis removed).[27]  This inquiry is "fact-

---

[27] In addition to serious abuse and neglect, the Second Circuit has suggested that a child's "extraordinary emotional dependence" may establish an Article 13(b) defense. *Id.*  Few courts, however, have found a grave risk of harm based on this consideration. *See Rial v. Rijo*, No. 10-CV-01578, 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010) (finding, in addition to evidence of some physical and verbal abuse, that the child's emotional dependence on her mother was "great" and crediting expert's testimony that the child would face serious "psychological trauma" if returned to the sole custody of her

intensive," requiring courts to consider "a wide range of conduct, including manipulative or alienating behavior, physical or psychological abuse, spousal abuse, [and] the petitioner's general pattern of or propensity for violence." *Cruvinel v. Cruvinel*, No. 19-CV-4237, 2022 WL 757955, at *6 (E.D.N.Y. Jan. 10, 2022). In every case, however, "[t]he potential harm *to the child* must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Souratgar*, 720 F.3d at 103 (emphasis added). As is customary with risk assessments, such risk "involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.*

For these reasons, the grave risk exception "is to be interpreted narrowly, lest it swallow the rule." *Id.* As with the rest of the Hague Convention, the Article 13(b) exception does not permit courts to evaluate underlying custody disputes; it is "not intended to be used by defendants as a vehicle to

---

father); *see also Ermini v. Vittori*, No. 12-CV-6100, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013) (declining to return child who faced no grave risk of harm when his brother did face a grave risk, given their close relationship and the harm and disruption that both siblings would suffer if separated).

Respondent has not explicitly argued that M.P.J. faces a grave risk of harm as a result of an "extraordinary emotional dependence" on her. Any such assertion would be complicated, at least, by the possibility that to credit that assertion might be to reward Respondent for removing her son from his father and heightening that emotional dependence.

litigate (or relitigate) the child's best interests."  *In re Lozano*, 809 F. Supp. 2d 197, 221 (S.D.N.Y. 2011).

Respondent asserts that "Petitioner is a physical and psychological abuser to Respondent and the child."  Resp't Br. 14.  The Court addresses Respondent's arguments in two parts: first, by evaluating the risk of physical or psychological harm M.P.J. faces from the Petitioner himself, and second, by examining the risk of psychological harm M.P.J. faces as a result of Petitioner's behavior towards his mother.  Neither argument, individually or taken together, is sufficient for Respondent to carry her high burden on the instant record.

1.  <u>Risk of Harm Directly to M.P.J.</u>

Evidence that repatriation would expose the child to abuse at the petitioner's hands goes directly to the grave risk of harm that Article 13(b) seeks to preclude.  Courts have found such risk of harm where the "petitioning parent ha[s] actually abused, threatened to abuse, or inspired fear [of abuse] in the children in question."  *Ermini v. Vittori*, 758 F.3d 153, 164–65 (2d Cir. 2014) (grave risk of harm where petitioner had "a propensity for violence and physical abuse," including a "habit of striking the children," causing them fear); *see, e.g.*, *Blondin*, 189 F.3d at 243, 247 (grave risk of harm where petitioner beat his partner and daughter, and on one occasion

tied a cord around his daughter's neck and threatened to kill both of them).

Respondent asserts that "Petitioner has used physical force on the child on multiple occasions, and on at least one occasion left bruises on the child." Resp't Br. 7. The record, however, reflects only one specific incident of physical force — the episode discussed above, in which Petitioner "slapped" M.P.J. when he was "still in diapers" because the child had "acted out." Tr. 55:14-25. While not in the room during the incident itself, Respondent testified that afterwards, she saw M.P.J. "crying" and further observed "color" and a "hand mark" on his rear. *Id.* at 57:1-6, 116:1-2.

The Court does not diminish the distress that Respondent suggests this caused. But the case law makes clear that this lone occurrence is insufficient to show that M.P.J. faces a grave risk of physical harm from Petitioner. "Sporadic or isolated incidents of physical discipline directed at the child" do not rise to the level of grave risk. *Souratgar*, 720 F. 3d at 104. In *Valles Rubio*, for example, evidence that Petitioner hit his son with a belt four times and once with a stick, although "disturbing" and "very concerning," did not establish a "sustained pattern of physical abuse" to constitute a grave risk of harm. 2019 WL 5189011, at *24-25. Isolated incidents of abuse that occurred "years ago" and did not require

44

medical treatment similarly fail to suggest a present grave risk of harm. *Broca v. Giron*, No. 11-CV-5818, 2013 WL 867276, at *5 (E.D.N.Y. Mar. 7, 2013) (finding no grave risk despite testimony that father hit child on three occasions — including with a broomstick and belt — but more than seven years prior), *aff'd*, 530 F. App'x 46 (2d Cir. 2013).

Whether or not it constitutes good parenting, Petitioner's treatment of M.P.J. here can fairly be characterized as "disciplinary in nature." *See Velozny ex rel. R.V. v. Velozny*, 550 F. Supp. 3d 4, 21 (S.D.N.Y. 2021), *aff'd*, No. 21-1993-CV, 2021 WL 5567265 (2d Cir. Nov. 29, 2021). According to Respondent's own testimony, Petitioner spanked the child, then a toddler, because he had acted out and to dissuade him from doing so in the future. While the slap caused M.P.J. to cry and left a mark on his backside, Respondent did not testify to more lasting harm. Moreover, this incident occurred at least five years ago, and Respondent has proffered no other instance to suggest that M.P.J. faces physical danger if returned. *See Broca*, 2013 WL 867276, at *5. Accordingly, this lone incident does not establish a present or future risk of physical harm.

Likewise, Respondent has not shown that M.P.J. faces grave risk of direct psychological harm from Petitioner. Respondent offered no evidence that Petitioner ever verbally or

emotionally abused M.P.J. by, for example, threatening physical violence or yelling at or berating him.  Instead, she testified only to what she called Petitioner's "indirect violence" against the child, providing several examples — posting his photos on the webpage and denigrating Respondent on phone calls with M.P.J. — that have occurred since the child's removal to the United States (and accordingly involve no direct contact).  Tr. 57:11–23.  Respondent did not demonstrate how these incidents would give rise to a grave risk in the event of M.P.J.'s return to Colombia.  In any case, they fall well short of the types of verbal or emotional abuse that courts have relied upon in similar cases.  *See, e.g.*, *Davies v. Davies*, 717 F. App'x 43, 47–48 (2d Cir. 2017) (affirming grave risk finding where, among other evidence of violence, the petitioner "scream[ed] profanities" at child and threw his toys in anger).

Finally, Respondent's assertion that M.P.J. faces a risk of harm from Petitioner is undermined by her own testimony that, after their separation in 2018, she left her son with Petitioner for days or even weeks at a time while she traveled outside of Colombia.  Based on this record, Respondent has not shown by clear and convincing evidence that M.P.J. faces a grave risk of harm from his father.

2.    <u>Risk of Harm from Exposure to Spousal Abuse</u>

Somewhat more compelling — but also ultimately unsuccessful — is Respondent's primary argument: that Petitioner's physical and psychological abuse toward *her* presents a grave risk of harm to M.P.J.  Resp't Br. 16.  To establish her Article 13(b) defense, Respondent must demonstrate by clear and convincing evidence — a "heavy burden" — that M.P.J. faces such a grave risk resulting from Petitioner's abuse.  *See In re Filipczak*, 838 F. Supp. 2d 174, 181 (S.D.N.Y. 2011), *aff'd*, 513 F. App'x 16 (2d Cir. 2013).

a.    Relevant Case Law

"Evidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense." *Souratgar*, 720 F. 3d at 104; *see Ermini*, 758 F.3d at 164. Courts consider evidence not only of physical abuse, but also of verbal and psychological abuse directed at one spouse by another.  *See, e.g.*, *Davies*, 717 F. App'x at 47-49.  Any such abuse, however, "is only relevant under Article 13(b) if it seriously endangers *the child*." *Souratgar*, 720 F. 3d at 103-04 (emphasis added).  Thus, the "Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Id*. at 104.

The Court's finding above regarding the absence of direct abuse of M.P.J. sets this case apart from others in which the grave risk finding was based on evidence of *both* partner abuse *and* physical or verbal abuse of the child or a wider propensity for violence.  Thus, the grave risk exception has precluded repatriation where the court concluded that the petitioner engaged in a "sustained pattern of physical abuse" directed at the respondent *and* their children: In *Ermini*, the petitioner "repeatedly" struck the respondent and was "in the habit of striking the children," who credibly expressed fear of their father.  *See* 758 F.3d at 165.  Similarly, a grave risk of harm existed where the petitioner routinely hit his two children and physically and verbally abused their mother, including an attempted strangulation and a "brutal" beating; as a result, both children developed post-traumatic stress disorders, and one suffered from suicidal ideations.  *See Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 399–400, 408 (E.D.N.Y. 2005).

This is not to suggest that evidence of physical and psychological abuse directed at the respondent cannot establish a grave risk of harm — it certainly can, as noted above, in appropriate circumstances.  Proof of spousal abuse, however, is insufficient to satisfy the Article 13(b) exception absent evidence that it would present an "intolerably grave risk *to the child*," such as "unavoidable psychological harm."  *Souratgar*,

720 F.3d at 104 (emphasis added).  This inquiry focuses on "how a small child would perceive and be affected by [any partner] abuse" and whether and how it would harm him.  *See Grano v. Martin*, 443 F. Supp. 3d 510, 542-43 (S.D.N.Y.), *aff'd*, 821 F. App'x 26 (2d Cir. 2020); *see also Ermini*, 758 F.3d at 164.  For this reason, "witnessing the abuse of [one's] mother is enough to establish the applicability of the defense" when such incidents are sufficiently frequent or severe.  *See Mohacsi v. Rippa*, 346 F. Supp. 3d 295, 322 (E.D.N.Y. 2018), *aff'd sub nom. In re Matter of NIR*, 797 F. App'x 23 (2d Cir. 2019); *Davies*, 717 F. App'x at 49 (finding no error in district court's grave risk finding "premised on overwhelming evidence of [petitioner]'s extreme violence and uncontrollable anger, as well as his psychological abuse of [respondent] over many years, much of which was witnessed by [the child]").  At the same time, even numerous incidents of a petitioner's abuse towards another may not create a grave risk of harm absent evidence of that abuse's impact on the child.  *See Souratgar*, 720 F.3d at 105.

*Souratgar* is instructive, if not controlling, on this point.  In that case, the Second Circuit affirmed the order directing the child's return, despite crediting the district court's findings that the petitioner abused the respondent, including by "shouting and offensive name-calling, and [in] several incidents of physical abuse in which he kicked, slapped,

grabbed, and hit" her.  *Id.* at 100; *see id.* at 104–06.  Even

against this "backdrop of domestic strife," *id.* at 103, the

respondent failed to establish a grave risk of harm because

"there [was] nothing in the record beyond speculation that [the

child] would suffer unavoidable psychological harm."  *Id.* at

104.  Instead, the child loved both parents, and "never saw or

heard either parent hit the other or try to hurt the other

parent."  *Id.*

Similarly, in *Broca*, the district court concluded that

the "record [was] replete with evidence" of "physical and

psychological incidents of abuse" against respondent, finding as

many as fifty incidents of physical violence that included

"hitting, shoving and punching [her] in the face."  2013 WL

867276, at *1, *5.  Nevertheless, the respondent in that case

failed to establish a grave risk of harm because there was

"little to suggest" that the petitioner's abuse of the

respondent extended to their children, and there was "no

evidence" that the children suffered "any psychiatric infirmity"

as a result of his behavior.  *Id.* at *5.

b.   Application

At bottom, Respondent has not demonstrated, by clear

and convincing evidence, that Petitioner's abuse towards her

exposes M.P.J. to a current or future grave risk of harm.

Despite presenting credible evidence of physical and

psychological abuse, she failed to demonstrate how such abuse would create a grave risk of present or future harm to M.P.J. This is particularly so in light of the sparse evidence that Respondent has faced abuse from Petitioner after their separation in 2018.  Respondent also proffered no evidence on the psychological impacts that Petitioner's past behavior might have on the child.  Considering this collective lack of evidence, together with the lack of evidence that Petitioner (outside of one instance) has mistreated M.P.J., the Court is constrained to conclude that Respondent has failed to satisfy her high burden under Article 13(b).

As noted above, Petitioner engaged in abusive conduct towards Respondent, particularly between 2011 and 2013, including several incidents where he choked and bit her and called her offensive names.  This is obviously serious misconduct, and something the Colombian courts may well take into account when considering questions of custody and visitation.  The inquiry here is a limited one, however, and there is simply no evidence in the record indicating whether or how M.P.J. — if he was alive at the time — was affected by these incidents.

On the contrary, Respondent testified that M.P.J. never saw Petitioner's abusive conduct or her reaction to it, with possible exceptions when he was a baby and therefore would

not remember.  She presented no evidence regarding the
psychological impact such abuse would have on a child who is not
old enough to recall or comprehend it.  *See In re Filipczak*, 838
F. Supp. 2d at 180 (finding no grave risk, even though the child
had witnessed one incident of spousal abuse, because she was
"roughly two years old" and "had no recollection" of the
episode).  Thus, "noticeably absent is any evidence that these
events took place in front of the [child] . . . or that they
have had any impact upon the [child]."  *See Velozny*, 550 F.
Supp. 3d at 19.  Without more, the Court cannot conclude, by
clear and convincing evidence, that the abuse Respondent endured
would present a grave risk of psychological harm to M.P.J.  *See
Souratgar*, 720 F.3d at 105.

Similarly, Respondent asserts that she was a victim of
Petitioner's psychological abuse and coercive control, enduring
repeated threats to reveal information about her past and to
take M.P.J. away from her.  Even fully crediting this testimony,
it does not support a finding that M.P.J. faces an intolerably
grave risk upon his return.  She introduced minimal, if any,
evidence concerning how the child perceived such abuse or
control, or how he was affected by it.  Thus, Respondent did not
demonstrate that Petitioner poses a grave risk to harm to M.P.J.
by virtue of his prior control over her.  *See Grano*, 443 F.
Supp. 3d at 542.

None of the cases that Respondent cites compel a different outcome, *see* Resp't Br. 14–15; indeed, they support the Court's conclusion.  In these cases, the child faced a grave risk based on evidence that the petitioner harmed the child directly, that the petitioner abused the respondent (often severely) and the child was aware of such abuse, or both.  *See Davies*, 717 F. App'x at 47–49 (affirming district court's finding based on "overwhelming evidence of [petitioner's] extreme violence and uncontrollable anger," as well as psychological and verbal abuse of both the respondent and child); *Walsh v. Walsh*, 221 F.3d 204, 219–20 (1st Cir. 2000) (finding that petitioner had an "uncontrollably violent temper," as well as a "clear and long history" of physically beating his wife, including in front of their children, and "of fights with and threats against persons"); *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) (affirming district court's finding that petitioner was "emotionally unstable and prone to uncontrolled destructive outbursts of rage," was "physically and verbally abusive" toward respondent in his son's presence, and had "physically endangered" his son); *Ischiu v. Garcia*, 274 F. Supp. 3d 339, 354 (D. Md. 2017) (finding respondent suffered physical, sexual, and verbal abuse at hands of her husband and his family, and that the child was aware of and witnessed some of that abuse).

Respondent's lack of testimony regarding recent abuse further weighs against a finding of grave risk.  Respondent testified primarily to incidents of physical abuse between 2011 and 2013, before M.P.J. was born in 2014.  Again, even fully crediting Respondent's testimony, the most recent incident between Petitioner and Respondent occurred in November 2017 — shortly before the parties separated and almost three years before Respondent traveled with the child to the United States. There was no testimony regarding physical or verbal abuse during this post-separation period, despite both parties living in Colombia.  Nor did Petitioner attempt any steps in Colombia, legal or otherwise, to remove M.P.J. from Respondent.  Instead, the parties established an informal custody arrangement for their son, who lived primarily with Respondent, and they split time according to a consistent schedule of contact.  During this time, Respondent was able travel freely, had access to money from sources other than Petitioner, and entered into a new relationship with Portela.

The parties' now years-long separation — together with evidence that they had established a working custody arrangement for M.P.J., one they apparently followed without any substantial incident — therefore suggests fewer opportunities for future strife between the two and a correspondingly lower risk of any resulting harm to M.P.J.  *See, e.g.*, *Eidem v. Eidem*, 382 F.

Supp. 3d 285, 293 (S.D.N.Y.) (noting that because the parties had divorced and would not be living together, "the likelihood of future physical [altercations] between them [was] remote"), aff'd, 796 F. App'x 27 (2d Cir. 2019); *Souratgar v. Fair*, No. 12-CV-7797, 2012 WL 6700214, at *11 (S.D.N.Y. Dec. 26, 2012) (noting, in response to respondent's argument that the child would "bear witness to petitioner's abuse," that "there is no credible evidence that petitioner and respondent will ever cohabit again").  Under these circumstances, "domestic violence allegations between the Mother and Father prior to their [separation] are not [as] probative to whether the Child is at a grave risk" now.  *In re R.V.B.*, 29 F. Supp. 3d at 258.

For similar reasons, the record does not establish, with sufficient probability, that Petitioner would resume his abusive behavior toward Respondent herself, if she and M.P.J. were to return to Colombia, so as to pose a grave risk to M.P.J. Moreover, as a practical matter, many of Petitioner's purported threats either have dissipated or now have little bearing on the grave risk analysis.  Petitioner's threats to take M.P.J. away from Respondent, for example, never came to fruition.  And because the Hague Convention requires the Court to defer any future determination of custody to the Colombian courts, the possible reduction or loss of access by Respondent to M.P.J. post-repatriation — one potential outcome of those custody

proceedings — does not constitute a grave risk of harm for Article 13(b) purposes.  *See Souratgar*, 720 F.3d at 106.

If anything, Petitioner has followed through on his threat to reveal sensitive details about Respondent's personal life, by creating the Google Site webpage.  While the Court is sympathetic to Respondent's position and takes note of the Colombian proceedings relating to the Google Site webpage, the damaging information that Petitioner threatened to publish has now been disseminated.[28]  As a result, Petitioner can no longer deploy such threats against Respondent.

Finally, in concluding that Respondent has failed to carry her burden, I note the absence of expert opinion on the nature of domestic violence as it relates to this matter, or the effects of Petitioner's behavior on M.P.J.  Cases "in which the court rejected the grave-risk defense either lacked expert testimony about the child's condition, or included contrary opinions from the petitioner's expert."  *See Jacquety v.*

---

[28] Without speaking to the merits of Respondent's pending Colombian legal claims, the Court notes that Petitioner credibly testified to sending the website link to only five of Respondent's relatives.  In litigating this matter, Respondent filed, as two separate exhibits without any redactions, a document with screenshots of the website as originally created in Spanish and an English-translation copy.  *See* Resp't Hr'g Ex. CI; Resp't Hr'g Ex. CI-T.  These two exhibits remained publicly available on the docket for months.  Only on November 2, 2022 did Respondent move for the first time to seal these exhibits, filing a blanket request to seal all transcripts and evidence in this matter.  *See* Resp't Mot. to Seal 1, ECF No. 151.  The Court denied this motion without prejudice, inviting Respondent to resubmit a renewed motion that proposed specific redactions and cited to relevant case law in support of those redactions.  *See* Docket Order dated Dec. 20, 2022.  To date, Respondent has not filed a renewed request.

*Baptista*, 538 F. Supp. 3d 325, 377 (S.D.N.Y. 2021) (collecting cases).  Expert testimony could have helped the Court evaluate, for example, any potential effects — current or future — stemming from Petitioner's behavior towards Respondent.  Neither party, however, introduced such evidence.  *Compare Kosewski v. Michalowska*, No. 15-CV-928, 2015 WL 5999389, at *17 (E.D.N.Y. Oct. 14, 2015) (finding no grave risk, despite credible testimony of petitioner's physical and verbal abuse of respondent, in part because "no expert testimony or impartial assessment of the child's mental state were presented at the hearing"), *with Mohacsi*, 346 F. Supp. 3d at 321–22 (finding grave risk where petitioner "engaged in a prolonged course of physical, sexual, and emotional abuse of Respondent," and expert testified to the "likelihood of continued abuse and harmful psychological effects [the child was] likely to experience were he to witness the abuse").

Respondent attempted to address this evidentiary gap in her post-hearing brief, which cites to several non-Hague Convention cases and law review articles on the nature and effects of domestic abuse.  *See* Resp't Br. 16–17.  These authorities stand for the proposition that violence by one parent against the other may detrimentally impact their child, even if he does not directly witness it.  *See id.*  The Court recognizes this common-sense possibility.  Respondent, however,

failed to offer any expert evidence regarding the specific facts in this case.  Absent such evidence, and given Respondent's heavy burden here, the Court cannot speculate on how Petitioner's abuse of Respondent may have affected M.P.J., particularly when she did not establish that M.P.J. comprehended any such abuse.

For these reasons, the facts presented to the Court — considered individually and together — fall short of establishing a grave risk of harm to M.P.J. by clear and convincing evidence.  Respondent thus fails to meet the high bar that the Article 13(b) exception demands.

The conclusion here is dictated, in large part, by the Court's limited remit in this Hague Convention proceeding.  As the Second Circuit has repeatedly emphasized, this is not a custody determination or family court proceeding.  "Domestic violence of any kind is pernicious, but under the Hague Convention the role of this Court is to determine what risk, if any, the children face if returned to their habitual residence." *Velozny*, 550 F. Supp. 3d at 19.  The Court's ruling today neither diminishes the seriousness of Respondent's allegations, many of which it found credible, nor condones Petitioner's violent or otherwise concerning conduct toward Respondent in the past.

Denying repatriation based on "evidence of spousal conflict alone, without a clear and convincing showing of grave risk of harm to the child," however, "would unduly broaden the Article 13(b) defense and undermine the central premise of the Convention: that wrongfully removed children be repatriated so that questions over their custody can be decided by courts in the country where they habitually reside."  *Souratgar*, 720 F.3d at 105-06.  Under the strict confines of the Hague Convention, these facts do not demonstrate by clear and convincing evidence that M.P.J. faces a grave risk of harm if returned to Colombia.

## C.   **Proffered Ameliorative Measures and Undertakings**

Because Respondent has not shown that M.P.J. would face a grave risk of harm, the Court need not consider Petitioner's alternative argument that Colombia can provide sufficient "ameliorative measures" to ensure the child's protection upon his return.  *See Grano*, 443 F. Supp. 3d at 544; *see also Poix v. Susibel Altagracia Espaillat Santana*, No. 22-CV-4980, 2022 WL 9847347, at *13 (S.D.N.Y. Oct. 17, 2022) (finding no grave risk and ordering return without consideration of ameliorative measures); *In re R.V.B.*, 29 F. Supp. 3d at 258 (same).  The Court nevertheless pauses briefly to address Petitioner's undertakings with respect to the conditions of M.P.J.'s return.  *See Rial*, 2010 WL 1643995, at *3 ("Even when a grave risk of harm is not present, . . . undertakings [can] be

used to ensure that a potential harm does not manifest when a child returns to his or her country of habitual residence.").

Petitioner has represented generally that it is possible for the parties to enter a voluntary "conciliation agreement," enforceable pursuant to Colombian law, governing their manner of communication and contact.  Pet'r Proffer of Potential Ameliorative Measure ("Pet'r Proffer") 1, 3, ECF No. 160.  Petitioner has offered to agree to — and states he "remains ready to negotiate" — reasonable restrictions that, among things, require him to maintain a certain distance from Respondent, her residence, and her place of work; and limit his manner and communication with Respondent to prescribed methods. *Id.* at 3-4.  This conciliation agreement, Petitioner asserts, would also require him to "acknowledge the wrongful nature of the acts he is proscribed from taking," as well as the legal consequences of any violation, which he indicates may include potential arrest and imprisonment.  *Id.* at 4.

Given the findings above, the Court need not condition M.P.J.'s return on the parties entering into any such agreement. These undertakings, however, are noted for the record and for any Colombian body that takes up custody or other proceedings involving the parties in the future to use as it sees fit.

Likewise, the Court notes, for the record and for any future proceedings, its finding that Petitioner has physically,

verbally, and emotionally abused Respondent in the past.  The Court further observes that, even while the parties remained in Colombia, Respondent was M.P.J.'s primary caretaker, and the child spent most of his time with his mother.

## IV.  Conclusion

For the reasons set out above, the Petition is granted, and M.P.J. must be returned to Colombia.  The Clerk of Court is directed to enter judgment in favor of Petitioner.  M.P.J. may not be removed from the Eastern District of New York prior to his return to Colombia.  The parties are directed to confer regarding the method and logistics of M.P.J.'s return — including as to the proposed return of M.P.J.'s passport, which is currently in the Court's possession.  If the parties agree on such matters, they should submit a proposed order; if they cannot agree, they should submit a single letter setting forth each party's respective position.  In either event, such submission should be made on or before April 20.  This Order is stayed for fourteen days to allow the parties to confer as directed, and to permit

Respondent to seek a stay from the Court of Appeals if she chooses.

        SO ORDERED.


                        /s/ Eric Komitee
                      ERIC KOMITEE
                      United States District Judge


Dated:     April 12, 2023
            Brooklyn, New York